Good morning, your honors. Steven Renick for the defendants and appellants, County of Riverside and Sergeant Sherry Anthony. If I may, I'd like to reserve four minutes for rebuttal. Thank you, your honors. As the briefs obviously revealed, there's a lot of issues we've raised. They fall into two basic categories, liability and damages with causation sort of floating between the two of them. And I'd like to address them in that way. First address the liability issue. And, uh, obviously the liability in this case, since it revolves simply around the single final shot that was fired by Sergeant Anthony, uh, re relates to her testimony only that she shuts Mr Smith because it was the fact the facts more specifically, it's well to remember that reaching towards a waistband has been found in this circuit to be sufficient justification for an officer to use deadly force. We've mentioned several cases in our briefing, uh, particularly Cruz versus city of Anaheim. Um, the language is very strong. It would be unquestionably reasonable for the mission if he reaches for a gun in his waistband, or even if he reaches there for some other reason, given Cruz's day, Mr Renick. Yes, Mr Renick. Can I ask you a question here? If you don't mind the if the evidence as to whether, uh, the individual reached the deceased reach for or was reaching for his waistband. If it's conflicted and the jury decides that liability is appropriate, it what do we do with that? And particularly when we have these videotapes that appear to show, uh, something other than reaching for his waistband? Well, I think the focus certainly from the Supreme Court's holding in Scott versus Harris is that we do look to the video. I mean, it's no question that that there is an issue in terms of just looking at the testimony. But I have to the suspect reaching for his waistband. Um, now there have obviously been different interpretations, uh, for what it's worth. I've looked at it. I think it shows him reaching for his waistband. Of course, two videos. Yes. Um, the, uh, our expert at trial believed that the, you know, testified that he was reaching his waistband. But part of the issue is that we don't actually need a final resolution of that issue because of the qualified immunity aspect of this issue. The question becomes more. Would a reasonable officer and Sergeant Anthony's position under all of the circumstances leading up to that moment have reasonably believed, even if she was ultimately mistaken, again, that he was reaching for his waistband. Uh, is your best argument, Mr Rennick, that, um, it is simply incorrect to use 2020 hindsight. And that's what we're seeing here in a situation that involved, I think, an eight second lapse of time and was fraught with tension and anxiety. That's I like the way you put it, Your Honor. Absolutely. And and within that context, I think we also need to put that in the context of what had happened really just moments before when Sergeant Anthony confronted Mr Smith the first time. And despite the fact that she had a gun pointed at him, he nonetheless attacked her. And actually, even though she was able to get a shot off, he successfully injured her. And so when she was confronted with him the second time, and she perceived rightly or wrongly that he was engaging in the sort of act that this circuit has said does provide justification for using deadly force that she reacted. Um, and I think your honor has put it exactly right. This is 2020 hindsight, trying to put ourselves in the place of an extremely fraught situation. Let me make sure I understand your argument. Let's say that the jury watched the video and simply disbelieved your client as to whether, in fact, Mr Smith was reaching for the race. What the jury saw was the man who had been shot multiple times was staggering back away from the officers clearly was, you know, at that moment, if the jury concluded that he was not reaching for his waistband is your had the right to fire that last shot. I don't think the issue is so much the jury's finding, because I would agree that that is what we presumably have to assume the jury found. But what the Supreme Court and Scott indicated is that where there is a video and where there's a dispute over the video, it's for the jury to resolve, right? That's that's the point. Well, I'm not sure. I think it's for the court to resolve. The court did resolve it and say there are disputed fact issues here that make it impossible for me to resolve it without a resolution of those disputes and therefore put it to the jury. And let me, um, tack on to that question. The added observation that at one way to look at the video, both of them is that is that they show that the deceased pants were, in fact, falling down and his waistband wasn't at his waist, which might make it more reasonable for the more likely to support the jury's finding that it was not reasonable for the officer to believe that an additional shot to the chest was needed. That's certainly an interpretation the jury might have made, and I ultimately believe that this court has an obligation to itself independently. Look at the video, but, um, I think we are where we are on that. Um, I'd like to move on to a second issue that sort of follows on from that, which is the which requires more than simply what was required in the survival action. It also requires a proof that Sergeant Anthony acted with either deliberate indifference or purpose to harm unrelated to legitimate law enforcement objectives. And we have the evidence is to the statement she made the night before to the mother. Exactly. And that's it. And that in order to find that to be, uh, sufficient, you have to take it completely out of context. You can ignore what Sergeant Anthony said was her explanation or justification and solely look at Miss Davis's explanation. And she says that statement was made in the context of her asking what's going to happen to my son? Is he going to be arrested? And her statement is, and I'm paraphrasing that's going to be up to a judge. But he assaulted an officer. He assaulted someone else. Uh, he's going to get it. The context is clearly what's going to happen to him once he is in custody. There's it's solely speculation to assume that Sergeant Anthony was essentially saying he's going to get it in the sense of somebody is going to inflict harm on him. Uh, and that substantial evidence that is not a basis on which you can reach a conclusion that there was a purpose in her firing the last shot other than legitimate law enforcement objectives. She may have been wrong, but there's no evidence that she was trying deliberately to harm, uh, uh, Mr Smith for malicious reasons. Um, council's talked about other in their answering brief other factors. But those factors all go into the incidents of the shooting. Uh, and the assumption that essentially is because he was shot, there must have been some purpose other than legitimate law enforcement reasons. That tooth is speculation. Um, so we would say that that that fact actor is missing from the, uh, from the proof that's necessary for that liability. Um, I see running closer to where I want to go. I believe we've discussed a lot of other issues in the case. One critical issue is that the argument here, all of the damages, all of the, uh, most of the damages flow from the assertion that, uh, Sergeant Anthony's shot killed, uh, Mr Smith. And the undisputed evidence is that there were at least four other fatal injuries inflicted on Mr. So we have an expert saying that that the expert doesn't know which one was, in fact, the fatal shot. Exactly. And so it becomes speculation to say that this was the one that, as I understand the standard in this circuit, it's but for proof. There has to be some evidence on what you could say. But for this shot, Mr Smith would have survived or at the very least would have survived for some appreciable time following this, where we could then get into the issue of to what extent was Miss Davis's familiar relationship interfered with? To what extent did, uh, Mr Smith suffer pain and suffering following the shot? Um, but there is nothing. Uh, it's simply don't we know that after the four shots before, um, Officer Smith fired her shot that the victim was able to stand back up again? Yes, but that doesn't change. The undisputed medical evidence that he had at that point suffered four mortal wounds. The fact that he was keep saying that as though it's a fact. But I read the coroner's testimony, and all he says is they were potentially fatal. And so whatever reason you all never sort of pinned down from a medical expert standpoint that, in fact, Mr Smith would not have been able to survive the shots that preceded the last. Well, I think potentially fatal means they're fatal unless something else happens. That's the only way I think that could be interpreted. It's not. It's not that your position is that the undisputed established that he would have died even if he had not been shot that final time. And I guess what I'm suggesting to you is that that's not what you're corner expert. I guess that was the only expert you put on to speak to that question. That's not what you said. Well, even even if we take it that way, which I think is is perhaps reading potentially there, then is no evidence at all as to whether or not this shot as opposed to any of the others caused the death. And we still then run into the same problem of proof. There's no proof that this shot as opposed to any of the other four potentially fatal shots are the one. Oh, you're kidding. You're kidding, right? He was shot four times in the chest, stood up, and when he is shot that last time collapses to the ground and does not get up after that. You're saying that a jury couldn't infer that? Well, maybe he would have survived those earlier ones, but we sure know he didn't survive that last one. That is a an undisputed fact. If there ever was one, I would disagree, Your Honor. But I understand. You know, why? Why would you disagree? Why would you disagree? I've watched that video probably five or six times, so five or six times more than I wanted to. And in fact, in fact, the witness testimony, as I recall, is that he was still breathing when the officers approached him, even after he was shot that last time. Uh, and then the ambulance comes and apparently he is no longer with you. You can take that as being if he was still breathing, then obviously it didn't immediately kill him. Well, then he raises the question. Well, now, right. But what is he? Which one does he die from? Does he die from that shot? Does he die from one of the prior four shots alive until he was shot the last time to judge Watford's point? Well, I was alive until he was shot that last time he was alive and on his feet. Correct. But he also was, as your honor has pointed out, alive after he was shot. So very long. Well, I don't know about that. You know how long he's Yes. And I see him running out of my time. And that that is part of, you issue two quick issues in terms of the finding of $1.5 million in pain and suffering. That's in the context of not knowing how long Mr Smith survived for whether he was conscious, what sort of if any pain and suffering he was undergoing, what its intensity was. In essence, the jury just picked the number and without any basis in facts to justify that number. And that's not the sort of evidence that's required for proof of this sort of injury regarding the familial relationship that requires some sort of, uh, immunization of the well, I won't get into that. Um, I'd like to reserve a little bit of time if I may. Thank you. We'll give you a couple minutes for about all right. Let's hear from counsel for the plan. Morning, your honors. Herbert Hayden on behalf of a Pele civil Davis in the estate of the decedent Anthony Smith. May it please the court. This case went to trial on November 13, 2018. After two weeks on November 26, 2018, the jury found that the appellant, Sergeant Anthony, excessive and unreasonable force against the decedent when she fired her final gunshot. We also found that Sergeant Anthony, the appellant, her use of force was the substantial cause of the decedent's fatal injuries. They proceeded to make the verdict awards in the amount of $1.5 million, as well as $1 million to the plaintiff appellee, reducing that amount by 30%. The standard for a renewed judgment as a matter of law requires that the court accept the evidence in the favor of the non moving party here. Plaintiff appellee Miss Davis. Counsel, can can I ask you maybe to zero in on the 14th amendment claim? It seems to me that that's just help me understand, um, why the jury? Because I understand how differential our review is of the jury's verdict. But why is that verdict in particular supported in your view by the other? I think first and foremost, Your Honor, this case has to do a lot with the credibility of the various witnesses, in particular Sergeant Anthony herself, as well as Miss Davis, who recalled the story of the as we've indicated in our moving paper in our in our opposition, answering brief. There's clearly a few of prior inconsistent statements that was put on wholesale for the jury to review when they deliberated. In particular, the the prior inconsistent statements were germane to the use of excessive force that the that the decedent didn't go to the ground that he was going to his ways that he lunged at her prior to her taking that last shot. All of those things were heard by the jury, and they also heard when Miss Miss Davis had to say the appellee and in the end, in the end, they decided that the credibility of Miss Davis was more than that of the appellant. What's your response to your opponent's argument, though, that fine, let's assume that the jury did not believe Sergeant Sergeant Anthony. I hope I'm not getting the names wrong. Did not believe the officer's account of that conversation, which I agree. It was different from Miss Davis's account. But I think your opponent argues that even if you accept Miss Davis's account, there still was no expression of a malicious intent to harm because it was in the context of response to Miss Davis's question about what's gonna happen to my son. Is he gonna get arrested? This or that? And that all even the he's going to get it comment could have conveyed was like the law is going to, you know, sort of come down on him harshly. Not that I am personally going to go out and hunt him down and try to hurt him. Well, I think first and foremost, you have the person who said the statement to the mother is actually the person that fires the final shot. First and foremost, I think that is important to recognize. I think also throughout the appellant's case before trial, they made such a huge issue of the injuries that defendant the offer suffered by the initial assault in the heart. And the jury was open to interpret that when Miss when the defendant appellant, Miss Sergeant Anthony, uh, arrived at the home, she saw how, uh, bloody day and battered that the deputy had been. And then she spoke with, um, the mother, uh, Miss Miss Davis, and she proceeded to tell her that he is gonna get it in no uncertain terms. So I believe when you you know what, Mr. And can I ask you to? Can I ask you to pause for one second? Did we lose, um, council for the for the appellant? I don't see him. Just hang on one second. Let's see if we can work this out longer. Richard, are you either be there? And can you tell me if we've lost or opposing counsel here? Perhaps we can text. Yes, opposing counsel has fallen off the call. Judge. Okay, then, Mr. And I'm gonna ask you to just hang on. Bear with us for a minute. Let's see if we can get him reconnected because he doesn't need to. Okay, it looks like we've got Mr. Rennick. Um, I don't know what happens. It's okay. It's all right. You're back. The good thing about our doing this via zoom, Mr. Renick, is that we could immediately see when you left. I asked Mr Hayden to stop, and we've been waiting for you to return. So you have not missed a thing. Thank you. I very much appreciate that, Mr Hayden. I apologize for interrupting you. I thought I had everything set. No worries. Okay, well, if you could put yourself back on mute, we'll let Mr Hayden continue his argument. Thank you again. Okay, very good. And so getting back to the 14th Amendment, the jury certainly looked at the video. They looked at the fact that this wasn't a split second decision that needed to be made. Actually, eight to 10 seconds took place from the time that the first volley finished, the decedent fell to the ground, and he rose and stumbled backwards and wavered and then was shot. There was a time that she, that the defendant appellant took and decided to make that shot. Knowing full well she'd already seen the decedent be fired upon multiple times and actually wounded. I think the jury, they saw that, and they believe that no other shot was necessary after the final shot, and it served no legitimate law enforcement purpose for her to make that shot, particularly given the fact that she, prior to the defendant's mother, the decedent's mother, excuse me, that he was going to get it. I think if we take into context the holding in AD versus the California Highway Patrol, the purpose to harm standard is a subjective standard of culpability, and that is given deference by the courts when the jury has made a decision. And I think most importantly as well, the jury knew that the partner of the defendant appellant, he did not shoot his weapon the final time, when she fired the final shot. He'd already fired how many shots? Ten? Ten shots, correct. However, he did not fire, he reloaded his weapon and did not fire when he, when the decedent rose from the ground. So I think the jury had ample enough facts to review to uphold the, their decision that there was a purpose for harm by the defendant appellant when she fired the final gunshot. And can I ask you, I appreciate your response to that question. Can I ask you to address as well then, whether the $1.5 million award on the Fourth Amendment claim was or was not excessive? We, we spent some time trying to find, you know, similar cases where the time that we lived after sustaining the fatal wound was as short as it was here. And to be honest, we couldn't, well, no, I don't know. I'd be interested to hear what you have to say on that point. I think there's some drowning cases, but sorry to interrupt. I think there's some drowning cases, but I'm not sure how comparable those are or not. Actually, I do have a case. It is not an appellate court case, but it is a Ninth Circuit, California case, Nunez versus Santos. It's 427 F sub 3rd, 1165 at page 1192. And it cites to Southern Pacific Company versus Headingham. And that's 236 F second 406. And it states that in an excessive force action involving lethal force, a jury is entitled to infer from the injuries experienced by the decedent that he survived for some period and experienced pain and suffering during that time, even in the absence of expert testimony. And that case also talks about Tortu versus Las Vegas Police Department 556 F third 1075. There is no precise rule for estimating damages for never calculated with a degree of mathematical certainty. However, within the human experience, the jury is able to understand what pain a decedent may have suffered, particularly in a instance like this. I think the defense, the appellant, do not take into consideration the testimony of the decedent received when we showed pictures of the wounds that he received with the true trajectory rods. I think it was well within their province to determine that the gunshot was painful. And if you would look at the cases that I say, I believe that they do support the notion that the 1.5 million was warranted. And I just say that a lot of the cases that the appellant have cited are dealing with nominal value jury awards, and that's just not what we have here. So I think it's apples and oranges. But Mr Hayden, how do you respond to the concerns that there really isn't any evidence of how long the decedent survived after the last shot or whether there's no evidence of moaning or visible signs of pain or suffering or even breathing for any kind for a defined period? It seems unclear how long he was breathing after the final shot and well, I'd look at the child reverse County of Los Angeles case that there's you know, you can't there. You can't put an appreciable time on a survivor's action like this. A wrongful death except the fourth and as the sentiment Nunez versus Santos case cited that I cited previously. The jury is it's within their province to to infer what sort of pain that a decedent might have received, given the injuries that the coroner described at time. Do you have? What would you say is your most helpful authority in the excessive force context for pre-death pain and suffering corresponding to a damages figure of this size? Just if you have something at hand. I believe the Willis versus city of Fresno case that's 2017 WL 5713374 at page six, as well as the Nunez case that I've cited. I don't remember what were the damages numbers there in those two cases? What did you provide me? One second. In the Nunez case, the excessive force claim was valued at $2.6 million. What was the evidence on the post shots or post violence survival time? It's not clear, but it was only a few seconds. It's not clear, but there was not a substantial significant amount of time. And I'd also argue that this case is similar to Hopkins versus and I don't have the damages amounts in the Hopkins case. But in that case, it was a seed and died almost instantaneously after the resumption of fire. The only point we can agree on is that it is imprecise. The question is, how imprecise is it permitted to be? Well, I'd certainly say that the Nunez case, you know, $2.6 million. The judge in that case did not reduce the excessive force claim damages that were awarded. The Willis case, I believe the award was reduced by $25,000 and it was in significant amount. So a six figure verdict as well. Yeah. But it's your can you remind me what the record evidence shows as to how long the decedent was breathing after he fell from the last shot? We do not know the length of time that he was breathing after the last shot. We do know that after he fell to the ground, the defendant appellant walked up to him and commented that he was laboring to breathe while he was on the ground and she called medical to come. That is the evidence on the record. Was was Mr Smith pronounced dead at the scene? Was he still alive when he was taken? He was pronounced dead at the scene. It's not how long did it take medical to arrive? I believe 5 to 6 minutes, but the A. M. R. Records were not my part of the trial record. What was the time of death? Do you recall how long after the last shot? Do you know? We'll check the record. Yeah. Okay. Um, Chief Judge Rosenthal. Do you have further questions? No. Just to hear from Mr Renick. Yes. Okay. Very good. Let's put two. Thank you, Mr for your argument. Let's put two minutes on the clock. Mr. Thank you very much, Your Honor. Just to quickly address the last issues. Uh, the Willis case is actually the best one to look at. I'm not familiar with Nunez. It wasn't cited in any of the briefing. And if the court would like us to offer some comments, we can submit a letter brief. Just let us know. But Willis, uh, the case did not allow. It happened to be our case. Uh, the plane was not allowed to receive any award for pain and suffering. Following trial, it went up to this court, which reversed in light of the child. Redecision and went back down for, uh, to take evidence on that sole issue of pain and suffering. And the total award for pain and suffering was 25,000. It wasn't the prior award of six figures had to do with other elements of the case. But the specific award of pain and suffering was for 25,000. Um, our point in in all of this, and I think your your honors have seen it, is that at some level, whatever the discretion may be of the jury, it has to have some sort of evidence to be basing it on. Uh, Your Honor, uh, Chief Judge Rosenthal mentioned moaning, breathing. How long? Something to give some sort of basis on which you can make a determination that the pain and because presumably there's a difference in what is being suffered by the individual that justifies a difference in amount. And here we know nothing. I mean, that is the bottom line. Well, we know that there was labored breathing after he had been finally shot and was on the ground. Absolutely. There is no question that he was alive, and I don't dispute council's assertion that on that basis, some award of pain and suffering could be made. But that award has to be based on something. Some knowledge of what the intensity was, how long it lasted, what the nature was something we can't just say he was suffering. He had pain. Therefore, we'll pick a number out of the air. I see I've gone over. If your honors have no other questions, we will submit. Okay. Thank you to you both for your arguments. The case just argued is submitted, and we are adjourned for the day. Thank you.
judges: Christen, Watford, Rosenthal